IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | INFORMATION |
| | ) | |
| | ) | Criminal No. 1:10CR40 |
| v. | ) | |
| | ) | In violation of: 18 U.S.C. § 371 |
| KENNETH D. HART | ) | 18 U.S.C. §1956 |

## COUNT ONE

THE UNITED STATES ATTORNEY CHARGES THAT:

A. INTRODUCTION

At all times relevant to this information:

1. KENNETH D. HART, the Defendant herein, along with several family members and friends, formed New Peoples Bank (NPB) on October 28, 1998. From the inception of NPB, until May 2009, HART was President and Chief Executive Officer.

2. NPB was a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation. NPB operates more than twenty-five branches which are located in the Western District of Virginia, West Virginia and Tennessee. NPB's main office is located in Honaker, Virginia, which within the Western District of Virginia and where HART maintained his office.

3. NPB provided training to its bank officers and board members regarding insider trading. Officers, directors, and employees were prohibited from trading in the company's stock while in possession of material, nonpublic information about NPB. NPB would also announce

blackout periods during which officers and board members, as well a friends and family members were prohibited from trading. Insider trading rules apply to individuals who have a fiduciary relationship with the Company and its shareholders, such as Company's executive officers, directors and other senior management. The policy is intended to prevent an insider from profiting from knowledge and access to information about NPB that the general public does not have. Family and close friends, ie. "tippees," were also precluded from trading on inside information. "Tippees" are individuals who trade upon material nonpublic information that they received from insiders. Information is considered material if a substantial likelihood exists that an investor would consider the information important in his or her decision to buy, sell or hold shares of NPB common stock, such as the price per share a potential buyer is willing to pay. On January 28, 2008, KENNETH HART signed a copy of NPB of Guidance In Connection With Trading Company Stock acknowledging he understood the restrictions related to insider trading.

4. The United States Securities and Exchange Commission (SEC) was an independent agency of the United States, which was charged by law with the duty of protecting investors by regulating and monitoring, among other things, the purchase and sale of publicly traded securities. Section 10b of the Exchange Act. Codified at Title 15, United States Code, Section 78j(b), and Rule 10b-5 thereunder, codified at Title 17, Code of Federal Regulations, Section 240.10b-5, prohibited fraudulent activities in connection with the buying and selling of securities, including "insider trading." NPB maintained a list of persons who wanted to sell their shares of NPB stock and would provide the list to prospective buyers so that the buyers could contact potential sellers and avoid any appearance of insider trading by person associated with NPB.

## B. THE INSIDER TRADING SCHEME

5. On July 10, 2008, a bank customer contacted an NPB branch manager in West Virginia. The customer stated that he wanted to invest in NPB by acquiring 500,000 shares of stock and was willing to pay $12 per share for a total investment of $6,000,000. The branch manager sent an email from her office in West Virginia to a co-conspirator at the NPB branch in Abingdon, Virginia. Defendant HART was notified of the customer's proposal. Over the next month or so the defendant and others used this inside information to aid and assist family members and friends in obtaining $12 per share for their shares of NPB stock. Many of the sellers were not included on the list of persons who wanted to sell the stock maintained at the NPB main office. The NPB Board of Directors was not advised of the proposed acquisition of a large block of NPB's stock.

6. In order to facilitate the scheme, on August 22, 2008, HART directed JL, not named as a defendant herein, to open a checking account which was styled F.D. Owens, Jr. Investment Account. Three deposits were made into the account totaling $6,600,000. The source of the deposited funds was cashiers checks remitted by the customer and the purpose of purchasing NPB stock. At the direction of defendant HART, a bank employee filled out the checks for the stock purchases from the investment account and JL came into the bank to sign the checks. 550,000 shares of NPB common stock were purchased from approximately fifty-four different shareholders. Nineteen shareholders received $11 or less per share, while the remaining sellers received $12 per share. Many of the shareholders who received $12 per share were family members and close friends of KENNETH HART who learned of the proposed purchase of stock

from HART. The shares were transferred to JL and later transferred to the customer. All shares transferred to the customer were recorded to have been purchased at $12 per share regardless of the amount paid to the sellers. After the final stock purchase on September 17, 2008, $209,586 remained in the Investment Account. Those proceeds were dispersed through checks written to individuals and entities of various family members and associates of KENNETH HART and a co-conspirator for their benefit.

### C. THE CONSPIRACY

7. From on or about July 10, 2008 and continuing thereafter until on or about at least April 21, 2009, in the Western District of Virginia and elsewhere, the defendant, KENNETH HART and others known and unknown to the Grand Jury, did knowingly, intentionally, and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to commit offenses against the United States to to wit:

    a. To use a means or instrumentality of interstate commerce or the mails to engage in an act, practice or course of business which operated as a fraud and decit upon persons in connection with the purchase or sale of any security. Commit securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

    b. To use and cause to be used the mails in the execution of a scheme or artifice to defraud in violation of Title 18, U.S.C. § 1341;

    c. To use and cause to be used interstate wire communications in the execution of a scheme or artifice to defraud in violation of Title 18 U.S.C. § 1343;

from HART. The shares were transferred to JL and later transferred to the customer. All shares transferred to the customer were recorded to have been purchased at $12 per share regardless of the amount paid to the sellers. After the final stock purchase on September 17, 2008, $209,586 remained in the Investment Account. Those proceeds were dispersed through checks written to individuals and entities of various family members and associates of KENNETH HART and a co-conspirator for their benefit.

### C. THE CONSPIRACY

7. From on or about July 10, 2008 and continuing thereafter until on or about at least April 21, 2009, in the Western District of Virginia and elsewhere, the defendant, KENNETH HART and others known and unknown to the Grand Jury, did knowingly, intentionally, and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to commit offenses against the United States to to wit:

    a. To use a means or instrumentality of interstate commerce or the mails to engage in an act, practice or course of business which operated as a fraud and decit upon persons in connection with the purchase or sale of any security. Commit securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

    b. To use and cause to be used the mails in the execution of a scheme or artifice to defraud in violation of Title 18, U.S.C. § 1341;

    c. To use and cause to be used interstate wire communications in the execution of a scheme or artifice to defraud in violation of Title 18 U.S.C. § 1343;

from HART. The shares were transferred to JL and later transferred to the customer. All shares transferred to the customer were recorded to have been purchased at $12 per share regardless of the amount paid to the sellers. After the final stock purchase on September 17, 2008, $209,586 remained in the Investment Account. Those proceeds were dispersed through checks written to individuals and entities of various family members and associates of KENNETH HART and a co-conspirator for their benefit.

### C. THE CONSPIRACY

7. From on or about July 10, 2008 and continuing thereafter until on or about at least April 21, 2009, in the Western District of Virginia and elsewhere, the defendant, KENNETH HART and others known and unknown to the Grand Jury, did knowingly, intentionally, and willfully combine, conspire, confederate and agree with each other and other persons known and unknown to the Grand Jury, to commit offenses against the United States to to wit:

    a. To use a means or instrumentality of interstate commerce or the mails to engage in an act, practice or course of business which operated as a fraud and decit upon persons in connection with the purchase or sale of any security. Commit securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

    b. To use and cause to be used the mails in the execution of a scheme or artifice to defraud in violation of Title 18, U.S.C. § 1341;

    c. To use and cause to be used interstate wire communications in the execution of a scheme or artifice to defraud in violation of Title 18 U.S.C. § 1343;

d. To knowingly execute and attempt to execute a scheme and artifice to defraud, execute and attempt to execute a scheme and artifice to obtain moneys, funds, assets, and other property by means of false and fraudulent pretenses, representations, and promises, owned by and under the custody and control of a financial institution in violation of 18 U.S.C. § 1344; and

e. To knowingly conduct and attempt to conduct financial transactions, affecting interstate commerce, which financial transactions involved the proceeds of specified unlawful activity in violation of Title 18 U.S.C. § 1956.

## D. OBJECT OF THE CONSPIRACY

8. The conspiracy was designed to allow the defendant HART and others to enrich themselves, their family, their friends and their business associates by fraudulent means through insider trading.

## E. MEANS AND METHOD OF THE CONSPIRACY

9. Various means and methods were utilized to effectuate the fraud and conceal its existence, including: providing false and fraudulent information, omitting material facts, and engaging in conduct the likely effect of which was to mislead and to conceal. Defendant HART's actions and the actions of others known and unknown to the Grand Jury demonstrated a departure from the fundamental principles of honesty, moral uprightness, fair play, and candid dealings as is common in the general life of the community.

## E. OVERT ACTS

10. In furtherance of the conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed in the Western District of Virginia and

elsewhere:

    a. On or about August 22, 2008, the FD Owens Investment Account was opened at NPB at the direction of KENNETH HART by a bank employee.

    b. On or about August 28, 2008, a co-conspirator sent an e-mail to a bank employee in West Virginia requesting the name to place on the customer's stock certificates.

    c. On or about September 2, 2008, a co-conspirator told RE that an individual was interested in buying RE's NPB stock and the offer was $11 per share.

    d. On or about September 2, 2008, a co-conspirator contacted CS and advised him that an individual wanted to buy his NPB stock at $11 per share.

    e. On or about September 3, 2008, a cashiers check in the amount of $1,528,500 was deposited into the FD Owens Investment Account in order to effectuate the purchase of NPB stock.

    f. On or about September 3, 2008, seven checks, totaling $1,424,374, were written to NPB stock sellers. The only individual in this group to receive $12 per share was MS, a business associate of a co-conspirator.

    g. On or about September 8, 2008, KENNETH HART directed his relatives to go to NPB and sign the required documents to sell some of their shares of NPB stock. Although the stock served as collateral on an NPB loan, HART directed a bank employee to release the shares. The stock sale generated more than $250,000 in proceeds.

    h. On or about September 8, 2008, eleven checks totaling $1,424,374 were written to sellers of NPB stock. Five of the sellers received between $10 per share and $11 per share, while six HART family members were paid $12 per share.

i. On or about September 8, 2008, an NPB employee contacted a co-conspirator about a rumor the employee had heard regarding someone wanting to buy NPB stock. The employee was told by the co-conspirator that the offer was $11 per share.

j. On or about September 9, 2008, the West Virginia bank employee sent an email to the co-conspirator that the customer asked who JL was and why he wanted to sell so much NPB stock. The co-conspirator responded in an e-mail:

> Just tell him he wanted to buy 500,000 shares at $12 and we had a list of potential sellers that wanted to get rid of stock. "FL" heard about him wanting to buy so he had been contacting these people and purchasing their stock in order to get rid of the people that wanted to sell their stock. This we feel will enhance the value of stock again. If you don't understand what I'm saying, I will call you later for a better explanation.

k. On or about October 20, 2008, a co-conspirator caused FD Owens Investment Account check number 1050 in the amount of $12,500 to be written to JS, whose relative worked at NPB and was directly supervised by the co-conspirator. The check was cashed and the proceeds returned to the co-conspirator.

l. On or about October 22, 2008, HART transferred $48,000 in fraud proceeds to four of his business associates. Each business associate was given an Investment Fund check in the amount of $12,000.

m. On or about December 2, 2008, HART and a co-conspirator caused FD Owens Investment Account check #1059, in the amount of $10,000, to be written to a friend of the conspirators.

n. On or about February 18, 2009, HART and a co-conspirator caused FD

Owens Investment Account check number check #1061, in the amount of $41,055, to be written to CMFL, a business in which they and their family had a financial interest.

      o. On or about February 27, 2009, HART caused three Investment Account checks, each in the amount of $6,000, to be written to business partners of defendant HART.

      p. On or about April 21, 2009, a co-conspirator caused a check from J'S, in the amount of $12,500, to be deposited into the FD Owens Investment account. The co-conspirator wrote on the deposit ticket "Repay loan."

11. All in violation of 18 U.S.C. Section 371.

## COUNT TWO

**THE UNITED STATES ATTORNEY FURTHER CHARGES THAT:**

1. The Introduction to Count One is realleged and incorporated into this Count of the Information.

2. From on or about July 10, 2008 and continuing thereafter until on or about at least April 21, 2009, in the Western District of Virginia and elsewhere, KENNETH HART, the defendant herein, did knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, to wit establishing the FD Owens Investment Account and causing checks to be issued from said account, which involved proceeds of a specified activity, that is, wire fraud, bank fraud, and the sale of securities knowing that the transactions were designed in whole or in part to conceal and disguise the nature, source, ownership and control of the proceeds of said specified unlawful activities, and that while conducting and attempting to conduct such financial transactions, detailed below, represented the proceeds of some form of unlawful activity, including the transactions listed below.

a. On September 3, 2008, a cashier check in the amount of $1,528,500 was deposited into the FD Owens Investment Account to be used to purchase NPB stock.

b. On September 8, 2008, a check in the amount of $148,692 made payable to a family member.

c. On September 8, 2008, a check in the amount of $148,692 made payable to a family member.

d. On February 18, 2009, a check in the amount of $41,055.12 made payable to a business that HART and his family members had a financial interest in.

e. On April 15, 2009, a check in the amount of $57,072 made payable to the United States Treasury for the personal Federal income tax liability incurred by JL relative to the stock transactions of NPB stock directed by HART.

In violation of Title 18 U.S.C. Section 1956(a)(1)(B)(i) and 2.

*[signature]*
Timothy J. Heaphy
United States Attorney