IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

FILED IN OPEN COURT
DATE 10-29-10
BY /s/ A Cook
DEPUTY CLERK
Abg DIVISION, W.D. of VA

UNITED STATES OF AMERICA )
)
v. ) 1:10CR40
)
KENNETH D. HART )

## STATEMENT OF FACTS

If this matter were to go to trial the United States of America would prove beyond a reasonable doubt with admissible and relevant evidence the following:

The Defendant, KENNETH D. HART, along with several family members and friends, formed New Peoples Bank (NPB) on October 28, 1998. HART served as President and Chief Executive Officer. His office was located at NPB's main office in Honaker, Virginia, which is within the Western District of Virginia.

NPB is a member of the Federal Reserve System and its deposits are insured by the Federal Deposit Insurance Corporation. NPB maintained branches in the Western District of Virginia, West Virginia and Tennessee. NPB's stock is publically traded and is subject to regulation by the United States Securities and Exchange Commission. To facilitate trading of NPB stock, NPB maintained a list of persons who wanted to sell their shares of NPB stock. Potential buyers would contact NPB to obtain the list and it was up to the potential buyers whom they contacted.

Members of the Board of Directors, Officers and employees were repeatedly advised not to become involved in trading using a material fact or providing a material

fact to others. A material fact is a fact that an investor would consider important in making an investment decision. Information regarding the number of shares an individual wanted to buy and the price he was willing to pay per share is a material fact. Board members and officers received training each year concerning the restrictions related to trading NPB stock. On January 28, 2008, KENNETH HART signed a copy of NPB's Guidance In Connection With Trading Company Stock acknowledging he understood the restrictions related to insider trading.

In July of 2008, RP, a NPB customer in West Virginia, contacted the Princeton, West Virginia NPB branch manager Karen Wimmer regarding his desire to invest in NPB by purchasing common stock. RP explained that he wanted to buy approximately 500,000 shares, was willing to pay $12 per share, and planned to invest about $6,000,000.

On July 15, 2008, Wimmer, after talking with RP, notified NPB Vice-President Gary Lawson by email that RP was prepared to start purchasing stock. RP had agreed to escrow funds to be used for the acquisition. Although HART was aware of the offer to buy the stock, the Board of Directors minutes of July 21 and August 18 do not reflect that RP's offer was ever mentioned.

HART enlisted Farrell D. Owens, Jr., an individual in his twenties and a neighbor of HART's, to contact NPB stock holders about selling their shares of stock. Owens, a high school dropout, had no experience in the securities industry, ~~and was working at~~  ~~the time for HART as a cattle hand~~. HART assisted Owens in opening a checking account at the Honaker NPB branch on August 22, 2008. The account was styled F.D. Owens, Jr. Investment Account. Although Owens had signature authority on the

checking account, Owens left signed checks with HART. HART directed bank employees to fill out the checks to pay sellers for their stock.

Three deposits were made into the FD Owens Investment Account totaling $6,600,000. The source of the deposits were cashiers checks, which were purchased by RP. 550,000 shares of NPB common stock were purchased from approximately fifty-four different shareholders. Nineteen shareholders received $11 or less per share, while the remaining sellers received $12 per share. Many of the shareholders, who received $12 per share, were family members and close friends of HART and/or Lawson who learned of the proposed purchase from HART or Lawson. Owens, at HART's direction, found several shareholders who wanted to sell their stock. All Owens related sales were all for less than $12 per share.

On September 2, 2008, Lawson told two shareholders that an individual was interested in buying their NPB stock and the offer was $11 per share. The next day a cashiers check in the amount of $1,528,500 was deposited into the FD Owens Investment Account. Seven Investment Account checks, totaling $1,424,374, were written to NPB stock sellers on September 3, 2008. The only individual out of the group of seven to receive $12 per share was MS, a business associate of Lawson.

Eleven checks, totaling $1,424,374, were written to sellers of NPB stock on September 8, 2008. Five of the sellers received between $10 per share and $11 per share, while six HART family members were paid $12 per share. A NPB employee contacted Lawson on September 8 stating he had heard a rumor that someone wanted to buy NPB stock. Lawson told the employee that the offer was $11 per share.

Two of the September 8 Investment Account checks, each in the amount of

$142,692, were given to HART's children for shares of stock they sold. Prior to transferring the shares from HART's children to Owens, HART compelled a NPB employee to release the shares. The shares at the time were being used as collateral for a NPB loan. Although HART told the employee he would inform the Board of Directors of the collateral release he never did. The checks were used to pay outstanding loans his children had at NPB.

Records maintained at NPB establish that all shares purchased with Investment Account funds were initially transferred into Owen's name. The shares were then grouped into large blocks and the large blocks were transferred to RP. NPB records indicated that all shares transferred to RP were purchased at $12 per share regardless of the amount actually paid for the shares.

RP became concerned when he saw in the records that Owens was purchasing all of the shares transferred to him. He asked Wimmer why Owens wanted to sell so many NPB shares. On September 9, 2008, Wimmer relayed RP's concerns to Lawson. Lawson responded in an e-mail:

> Just tell him he wanted to buy 500,000 shares at $12 and we had a list of potential sellers that wanted to get rid of stock. "FL" heard about him wanting to buy so he had been contacting these people and purchasing their stock in order to get rid of the people that wanted to sell their stock. This we feel will enhance the value of stock again. If you don't understand what I'm saying, I will call you later for a better explanation.

After the final stock purchase on September 17, 2008, $209,586 remained in the FD Owens Investment Account. HART and Lawson dispersed those proceeds by causing checks to be written to family members, business associates, and businesses

in which they had an interest. On October 22, 2008, HART caused four checks, each in the amount of $12,000, to be made payable to four of his cattle business associates. The money was used to pay down lines of credit, which allowed the associates to continue to draw on their line of credit in order to fund cattle purchases.

On February 18, 2009, HART caused FD Owens Investment Account check number check #1061, in the amount of $41,055.12, to be written to Clinch Mountain Flooring and Logistics (CMFL), CMFL was a business that HART, HART's children and Lawson had an ownership interest in. CMFL had previously obtained economic development funds from the Commonwealth of Virginia and loans from NPB. Not only was HART and Lawson guarantors on the Grant, but the loan was on NPB's watch list, as being a risky loan. Although, the proceeds diverted to CMFL from the FD Owens Investment Account were said to be a "loan", no loan documents exist. The money was used to pay down a NPB loan, which HART's children, Lawson and their business associates were responsible for. After the investigation was initiated, CMFL issued a check in the amount of $1,000 to Owens as an alleged loan payment.

The disbursement of the criminal proceeds continued through April of 2009. On February 27, 2009, HART caused three Investment Account checks, each in the amount of $6,000, to be written to his cattle ranch business partners.

Owens contacted a Tax Preparer, who determined that based on the transactions which occurred in the Investment Account, Owens had incurred a tax liability. HART and Lawson contacted individuals who had benefitted from the account and requested that they return some of the proceeds. Some of the funds were returned and on April 15, 2009, an Investment Account check in the amount of $57,072 was sent

to the United States Treasury to pay the personal Federal income tax liability of F D Owens.

In October 2008, NPB's Chief Financial Officer and the ~~Director~~ Executive Vice-President CPH KH of NPB'S stock department, discovered the Owens account and confronted HART. HART told them to mind their own business. When asked who FD Owens was, HART ~~became upset and~~ CPH KH said Owens was nothing but a "jackleg". Webster's dictionary defines a jackleg as someone characterized as ~~being unscrupulous, dishonest, and/or~~ CPH KH lacking professional standards, skills or training. The matter was turned over to outside counsel. Outside counsel completed their investigation and provided Federal authorities with their findings. Additionally, NPB paid sellers who sold their stock for less than $12 per share the difference between what they were paid per share and $12.

HART testified before a Federal Grand Jury in Abingdon, Virginia on June 24, 2009. During that testimony HART acknowledged he was aware of the SEC rules and wanted to "stay back as far from it, but I wanted to get these two groups together." When asked about what happened to proceeds remaining after the purchase, HART

stated that a large portion of the proceeds "made into loans." HART acknowledged that Owens agreed to the loans after HART asked him.

Respectfully submitted,

TIMOTHY J. HEAPHY
UNITED STATES ATTORNEY

_____
C. Patrick Hogeboom III
Assistant United States Attorney

**SEEN AND AGREED:**

_____
Kenneth D. Hart
Defendant

Joshua C. Johnson

_____
~~Guy Harbert~~, Esquire
Counsel for Defendant

_____
GREG HANCOCK
~~Guy Harbert~~, Esquire
Counsel for Defendant